## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

PAM ASCHENBRENNER,        )        CASE NO. 8:10CV00153
                             )
        Plaintiff,           )
                             )        MEMORANDUM
        v.                )        AND ORDER
                             )
DOLGENCORP, INC.,         )
                             )
        Defendant.       )

This matter is before the Court on the Defendant's Motion for Summary Judgment (Filing No. 63) and the Defendant's Motion to Strike and Objections to Evidence Offered in Opposition to Defendant's Motion for Summary Judgment (Filing No. 74) filed by Defendant Dolgencorp, Inc.[1] ("Dollar General"). For the reasons discussed below, the Defendant's Motion for Summary Judgment will be granted and the Motion to Strike will be denied as moot.

## BACKGROUND

Plaintiff Pam Aschenbrenner ("Aschenbrenner") is a former store manager for Dollar General. Aschenbrenner alleges that she was improperly classified as an exempt employee under the Fair Labor Standards Act of 1938, 29 U.S.C. § 201 *et seq.*, ("FLSA"), and that Dollar General willfully violated the FLSA by not paying her overtime compensation for each workweek in which she worked more than forty (40) hours. Aschenbrenner seeks compensation for the overtime worked, an equal amount of liquidated damages, pre-

---

[1] On October 9, 2008, Dolgencorp, Inc. converted to a limited liability company and is now Dolgencorp, LLC. Dolgencorp, LLC, operates the retail Dollar General stores in Nebraska and is the proper Defendant in the instant matter. Although the legal structure and name of the entity has changed, only Dolgencorp, LLC remains in existence. On May 21, 2010, Plaintiff filed a Third Amended Complaint (Filing No. 37). In it, she dismissed the other previously named Defendants. All references to "Defendant" or "Dollar General" herein incorporate Dolgencorp, Inc., and Dolgencorp, LLC.

judgment interest, attorneys' fees, and costs.  The central issue in this case is whether Aschenbrenner's "primary duty" was "management" such that she qualified as exempt under the FLSA's executive (or managerial) exemption.

## II.  PROCEDURAL HISTORY[2]

Aschenbrenner agreed to bring an FLSA claim against Dollar General on March 8, 2004.  Originally, she was an opt-in plaintiff in a collective action filed against Dollar General in the United States District Court for the Northern District of Alabama.  The class in the collective action was decertified, however, and this case was severed and assigned an individual case number in the Northern District of Alabama, then consolidated with the cases of other similarly situated, former opt-in plaintiffs for purposes of discovery.  On March 30, 2010, this case and several other similar cases were transferred to this Court.[3]

## III.  UNDISPUTED FACTS

The Third Amended Complaint (Filing No. 37), the Defendant's Answers (Filing Nos. 5, 6, 47), the parties' briefs (Filing Nos. 64, 72, 76), and the indexes of evidence (Filing Nos. 68, 73) demonstrate that the following facts are not in dispute:

Dollar General, at all times relevant, was a retailer of basic consumable goods – items that are frequently used and replenished by consumers, including cleaning supplies, health and beauty aids, foods, snacks, housewares, toys, and basic apparel.  Dollar General operated its stores according to uniform Standard Operating Procedure manuals

---

[2]The full history of the litigation is summarized in the parties' proposed discovery schedule (Filing No. 36).

[3] This action has been designated as the lead case among several consolidated cases pending before this Court: 8:10CV155, 8:10CV156, 8:10CV157, 8:10CV158, 8:10CV159, 8:10CV160, 8:10CV161, 8:10CV162, 8:10CV163.  However, this Memorandum and Order applies solely to the disposition of 8:10CV153.

("SOP manuals").  Each Dollar General store had one store manager, who was the only salaried employee in the store.  The store manager received store-mail regarding various issues.  It was the store manager's responsibility to implement the store-mail directives in his or her store.  Each store manager directed employees and was charged with ensuring that his or her store made a profit.  The decisions of Dollar General store managers could affect store profitability.

In addition to their weekly salary, store managers were eligible for certain bonuses, such as an annual "Teamshare" bonus.  During Aschenbrenner's employment, a store manager's bonus was tied to the financial performance of the store manager's own store and the store manager's individual performance, rather than the company's or district's overall profits.  During Aschenbrenner's employment, an Assistant Store Manager ("ASM") could receive 30 percent of the store manager's potential bonus.

Dollar General evaluated store managers on store performance and leadership metrics.  Store managers were rated in seven different categories: sales volume, inventory shrink,[4] safety awareness, training and development, controllable expenses, customer satisfaction, and merchandising.   These ratings could affect the store manager's compensation, specifically, the manager's raises and bonuses.

In 1995, Dollar General began a study to determine whether some or all of its store managers, who at that time were classified as non-exempt[5] employees, met the FLSA

---

[4] In the retail industry, "shrink" is a term for merchandise that is unaccounted for at the time of inventory; causes of shrink include damaged merchandise, customer theft, and employee theft.

[5] Non-exempt employees are paid an hourly wage and entitled to overtime pay for working more than forty (40) hours in a given workweek.

requirements for classification as exempt[6] employees. Dollar General asked store managers to complete a survey detailing time spent on their job duties, including managerial tasks. Relying on the survey results,[7] Dollar General converted store managers who reported spending at least 51 percent of their time performing managerial tasks from non-exempt to exempt status. Although Dollar General recognized that there was no FLSA requirement that an employee perform more than 50 percent managerial tasks to be exempt, it decided that 51 percent would be used as a threshold for determining whether to convert an individual to exempt status. Before converting the store managers to exempt status, Dollar General asked each store manager to confirm his or her survey response that he or she spent at least 51 percent of his or her time performing managerial tasks. Those store managers whose surveys did not demonstrate that the individual spent at least 51 percent of his or her time performing managerial tasks were not converted to exempt status at that time and were provided additional training regarding Dollar General's expectations for the store manager position.

Aschenbrenner worked for Dollar General from 1994 until her resignation in September 2002. During Aschenbrenner's employment, all Dollar General store managers reported to a District Manager ("DM"). Dollar General expected that DMs would visit each store in his or her district periodically, approximately once per month. District Managers typically did not have keys to the stores in their respective districts. In addition to the store

---

[6] Exempt employees are paid a salary and not entitled to overtime pay for working more than forty (40) hours in a given workweek.

[7] The Court notes Aschenbrenner's position that the survey was "flawed." (*See* Filing No. 72, Pl. Br., at 66 ¶ 22.) Nevertheless, the Court also notes that Aschenbrenner denied this fact only in part and even assuming the survey was flawed, this fact is still relevant to the Court's analysis of the alleged "willful" nature of Dollar General's actions. (Filing No. 37, Third Amended Complaint, at 3 ¶ 20.)

4

manager, Dollar General stores were ordinarily staffed with one ASM, one Lead Clerk, and several store clerks.  Stores at which Aschenbrenner worked had an average of seven to eight employees.

Sandy Marney, a Dollar General DM, hired Aschenbrenner as the store manager for Store No. 2788, in Plattsmouth, Nebraska.  Aschenbrenner served as a store manager during her entire tenure with Dollar General.  Aschenbrenner worked as the store manager for Store No. 2788 from 1994 through the late 1990s.  After Aschenbrenner "cleaned up" Store No. 2788, she requested a transfer to Store No. 2749 in Bellevue, Nebraska, to gain more experience managing a larger, metro-area store.  In early 2000, Aschenbrenner requested a transfer to Store No. 3666, also in Bellevue, Nebraska, to gain experience managing a brand new store.  In April 2000, Aschenbrenner requested a transfer back to Store No. 2788 in Plattsmouth, Nebraska, because she perceived that Store No. 3666 was running smoothly and she wanted more of a challenge.  Aschenbrenner remained the store manager for Store No. 2788 until she resigned from Dollar General in 2002.

During her tenure with Dollar General as a store manager, Aschenbrenner's status changed from non-exempt to exempt.[8]  From 1994 until 2001 Dollar General classified Aschenbrenner as non-exempt and compensated her based on a hourly wage.  Beginning in January 2001, Dollar General classified Aschenbrenner as exempt and compensated her based on a weekly salary.  Aschenbrenner earned $576.02 per week in January 2001, $593.23 per week in April 2001, and $612.06 per week  in 2002.  Aschenbrenner knew that she would get the same weekly salary without regard to the number of hours she worked.

---

[8] Aschenbrenner's claim is based on her classification as an exempt employee.  Therefore, the time period during which she was classified as a non-exempt employee is irrelevant.

The ASM was the second-highest paid employee in Aschenbrenner's stores. Aschenbrenner agreed that her own weekly salary was "substantially more" than the weekly wages her ASMs were paid,[9] which ranged from $6.50 to $7.50 per hour, or $260.00 to $300.00 for a forty (40) hour workweek.

Aschenbrenner understood that her bonus eligibility was based upon the success and profitability of her own store. As the store manager, Aschenbrenner was eligible to earn an annual bonus of up to 10 percent of the store's net profit not to exceed 100 percent of her base salary. For example, if the store's net profit was $75,000, then Aschenbrenner could earn up to a $7500 bonus. In other words, every additional dollar of losses or unnecessary expenses incurred by the store would decrease Aschenbrenner's bonus potential by ten cents. According to Aschenbrenner, when her store was successful, she was successful, and vice versa. Aschenbrenner received an annual bonus every year that she was a store manager, including a bonus of $5,900 in 2001, and $7,675 in 2002.

During Aschenbrenner's employment, ASMs were eligible to earn an annual bonus of up to 3 percent of the store's net profit. If the store's net profit was $75,000, then the ASM would be eligible for bonus up to $2250. The bonus pool available to store clerks (when clerks were bonus eligible) was no more than 2 percent of the store's net profit (i.e., $1500 assuming the store's net profit was $75,000). Aschenbrenner determined which clerks would share in the bonus pool and how much each clerk would receive.

---

[9] In her 2010 deposition Aschenbrenner admitted that her weekly salary was "substantially more" than her ASM's weekly pay. Filing No. 73-46 - Aschenbrenner Dep., 2010 p. 69:23-70:3. Nevertheless, in her brief she argues that "[a] reasonable jury could conclude that [Aschenbrenner's salary wa]s not 'substantially more' as Dollar General alleges." (Filing No. 72, Pl. Br., at 39.)

Ordinarily, Aschenbrenner's store was staffed with one ASM and two to three clerks, however, five to seven clerks worked on truck days because more employees were needed to unload the truck and stock the merchandise. Dollar General provided Aschenbrenner with a weekly labor budget for her employees (all of whom were non-exempt, hourly employees). Aschenbrenner's store schedules, which represent the hours of labor utilized, show that her store was budgeted for more than 150 employee hours per week, and often exceeded 200 employee hours per week from March 2001 through September 2002.

Aschenbrenner had three different DMs during her tenure: Denise Tyson, Sandy Marney, and Byron Thompson. Aschenbrenner's DMs were not frequently present in her store, and their visits generally lasted a few hours. Early in her tenure as a store manager, Aschenbrenner's DM visited her store about nine or ten times per year and, on each visit, spent approximately half a day in her store. During these visits, the DM would review the store's paperwork, monthly reports, and payroll. The DM would also walk through the store with Aschenbrenner to give her ideas for improvement. As she became more experienced, Aschenbrenner saw her DM less frequently. Aschenbrenner testified that her DM did not need to come to her store as often because the DM knew that Aschenbrenner did not need help. Instead, the DM would spend time with new managers and poorly performing stores.

One of Aschenbrenner's primary responsibilities was to ensure that her store was profitable. Aschenbrenner credited herself with improving the profitability of the three stores for which she served as the store manager. According to Aschenbrenner, excluding the brand new store, each of her stores started out as either a "high-shrink" or "broken" store, but she ameliorated those problems and increased profitability. When she returned to Store No. 2788 in April 2000, Aschenbrenner found that "recovery wasn't there"; that

7

"[t]he customer service wasn't there"; and that it "[j]ust needed to be revamped again," as she had done when she first worked in the store from 1995 until the late 1990s. (*See* Filing No. 73-46, Aschenbrenner Dep., 2010 at 17:10-25, 88:2-12 (hereinafter "2010 Dep.").)

Aschenbrenner agreed that she performed all of the duties and essential functions as described in the Dollar General store manager job description. Aschenbrenner admitted that, throughout her employment, she performed some[10] of the following duties as a store manager: taking and reviewing applications, interviewing candidates, checking references, making job offers, setting up new employees on payroll, orientation and training of new employees, training and ongoing development of employees, making recommendations for adjustments to pay rates, conducting performance reviews, monitoring performance of employees, planning the work to be done, setting the weekly schedule, assigning work hours to employees, preparing and transmitting payroll, directing the work of store employees, giving guidance, setting and monitoring daily "to do" lists, handling employee complaints, conducting disciplinary action (including progressive counseling and termination), ordering merchandise for the store (including choosing appropriate quantities and merchandise), controlling the flow of merchandise (including the receiving of merchandise and planning of stocking of merchandise and directing the flow of merchandise from the back door delivery to the sales floor), providing a safe work environment (including ensuring compliance with all company safety policies), ensuring that company policies and guidelines were being followed by all other employees, preparing deposits, transmitting daily sales information, and preparing and checking store paperwork.

---

[10] "[W]hile Aschenbrenner admits performing *some* of the duties listed[,]" she does not specify which of the listed duties she did not perform. (*See* Filing No. 72, Pl. Br., at 69 ¶ 36 (emphasis added).)

8

Aschenbrenner was responsible for ensuring that employees in her store followed Dollar General policies, such as the dress code and procedures for making employee purchases. She also assigned employees to handle store cleaning and monitored their performance to ensure that it was up to her standards and Dollar General's standards.

Aschenbrenner had full authority to hire store clerks, and was not required to get approval from her DM before making these hiring decisions. Aschenbrenner credited part of the success of her stores to the fact that she hired the right people and properly trained her employees. According to Aschenbrenner, hiring one dishonest employee could cause a substantial amount of shrink.

Aschenbrenner was also responsible for identifying store clerks whom she believed should be promoted and making promotion recommendations to her DM. For example, Aschenbrenner recommended that Patricia Jackson, Cynthia Schwartz, Pamela Mielitz, Recinda Toman, and Danielle McGroty be promoted to ASM, and her recommendation with regard to each was accepted. When Aschenbrenner resigned she recommended that McGroty be promoted to store manager, as her replacement. Aschenbrenner's DM accepted this recommendation as well.

Aschenbrenner also trained the employees whom she hired to work in her stores. Aschenbrenner trained employees to set up planograms.[11] Aschenbrenner discussed safety issues with her employees by leading safety meetings. Aschenbrenner testified that one of the first things she did to improve shrink problems in her stores was to review with

---

[11] A planogram is a diagram showing where items should be placed in the store and how many of a particular item should be placed on each shelf. (*See* Filing No. 73-45, Aschenbrenner 2005 Dep., 66:17-67:4.)

9

her employees Dollar General's policies for minimizing shrink.  In addition to ensuring compliance with company policies, one of Aschenbrenner's goals in training employees was to enable them to advance within the company.  For example, as a training tool, Aschenbrenner asked her ASM to sit in when she interviewed store clerk candidates. Aschenbrenner also trained her ASM to watch for issues in the store, such as dishonest employees and customer theft.  Aschenbrenner hired and trained at least two employees who were later promoted to store manager.

When Aschenbrenner was out of her store, she prepared lists of assignments that she left with her ASM, and would hold the ASM accountable for ensuring that the tasks on the list were completed.  Also, when out of her store, Aschenbrenner received phone calls from employees asking her to make decisions and answer questions regarding store operations.  These calls became less frequent as her staff became more experienced.

Aschenbrenner was the sole person responsible for evaluating the performance of the ASM, Lead Clerk, and store clerks who worked in her store.  Aschenbrenner agreed that the performance reviews she prepared for employees in her store could affect whether they would be selected for promotions.  Aschenbrenner testified that it was important for her to consider the abilities and performance of each employee when filling out review forms.  Aschenbrenner's DM did not tell her how to rate individual employees, and the scores Aschenbrenner gave each employee were based on her own observations.

Aschenbrenner also performed progressive counseling with employees, often as the first step leading to an employee's termination.  Aschenbrenner DMs advised her of the wording to be used in written counseling forms, to ensure it was understood by the employee receiving the counseling.  Aschenbrenner acknowledged that counseling records

were made based on her own observations or reports that she herself investigated. Aschenbrenner completed a "personnel action form" for each employee in her store who was terminated or resigned, and she often included her own notes on the forms, such as "stole paychecks from the store," "never returned to work," and "not rehirable." To Aschenbrenner, these notes were important for Dollar General to understand why someone was no longer employed and whether she believed that the person should receive an opportunity to be rehired by Dollar General.

Aschenbrenner prepared the store schedule. She agreed that scheduling was important to ensure that her labor budget was used as efficiently as possible. Aschenbrenner also agreed that preparation of the schedule could be challenging because she had to make decisions about how to allocate her labor budget.

The profitability of Aschenbrenner's store (and, by extension her compensation) was directly affected by, among other things, the store's cleanliness, the merchandise kept in stock, the maintenance of accurate inventory levels, the training and development of employees, and the elimination of theft by customers and employees. Aschenbrenner acknowledged that it was her responsibility to monitor and supervise each of these potential risks. Aschenbrenner also was responsible for verifying the paperwork that accompanied vendor deliveries. Her verification was important because if a product delivered did not match the paperwork, it would result in shrink, which would hurt the store's profitability.

Aschenbrenner monitored customers to prevent shoplifting, and was the person who would decide whether to call the police if a shoplifter was caught. Aschenbrenner trained her employees to watch for suspicious behavior as well, and instructed them that if they thought someone was shoplifting, they were to call her. She stated that she shared some

11

of her methods for monitoring the store with other employees, but withheld some methods from the store clerks in order to monitor them.  She exercised her discretion to decide how much to tell clerks, and agreed that she was the person who had to decide what was in the best interest of her store.

Dollar General determined what merchandise to place on most of the end-caps[12] in Aschenbrenner's store.  Aschenbrenner used her discretion to determine what to place on the end-caps not controlled by Dollar General, so-called "manager's choice" end-caps.  In so doing, she would consider what items needed to be sold quickly, or which items would sell best.  Aschenbrenner also trained her ASM to merchandise[13] the discretionary endcaps.  If a product on a shelf that was not an endcap sold out, Aschenbrenner was the person responsible for deciding how that space should be filled.

Aschenbrenner agreed that she was managing the store at all times, no matter what else she was doing.[14]  Even when stocking shelves or running a cash register, she still monitored the store and its employees.  During Aschenbrenner's tenure, there were no surveillance cameras, so she continually watched customers and employees.

In addition to her other duties, Aschenbrenner served as Dollar General's representative in legal compliance at her store. She ensured that Dollar General's discrimination and harassment policies were enforced.  She completed federal immigration

---

[12] An end-cap is the shelf space at the end of the aisle.

[13] Merchandising is simply displaying an item for sale. (*See* Filing No. 73-46, Aschenbrenner Dep., 2010, at 94:15-19.)

[14] Aschenbrenner denies that she was managing *anybody* during the time she was in the store alone, however, the Court concludes that this denial is irrelevant given Aschenbrenner's statement that she was managing *the store* at all times.  (Filing No. 73-46, Aschenbrenner Dep., 2010, at 100:20-23 (emphasis added).)

12

forms confirming that she had seen documentation that each individual she hired in her stores was authorized to work in the United States. She ensured that employees were paid for all hours worked by verifying that employees knew that they were required to clock in and out when they worked, and by submitting their payroll hours to Dollar General. Aschenbrenner also testified in court once as a witness on behalf of Dollar General in a shoplifting matter.

## STANDARD OF REVIEW

Summary judgment is only proper when the Court, viewing the evidence in the light most favorable to the nonmoving party and drawing all reasonable inferences in the nonmoving party's favor, determines the evidence "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Semple v. Federal Exp. Corp.*, 566 F.3d 788, 791 (8th Cir. 2009) (quoting *AgriStor Leasing v. Farrow*, 826 F.2d 732, 734 (8th Cir. 1987)). "Where the nonmoving party will bear the burden of proof at trial on a dispositive issue, . . .. Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves...." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). The moving party need not negate the nonmoving party's claims by showing "the absence of a genuine issue of material fact." *Id.* Instead, "the burden on the moving party may be discharged by 'showing' . . . that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

In response to the movant's showing, the nonmoving party's burden is to produce specific facts demonstrating "a genuine issue of material fact such that [the] claim should

proceed to trial." *Nitro Distrib., Inc. v. Alitcor, Inc.*, 565 F.3d 417, 422 (8th Cir. 2009) (internal quotation marks omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986)).  The nonmoving party is required to demonstrate a "genuine issue of material fact" that is outcome determinative–"a dispute that might 'affect the outcome of the suit under the governing law . . . .'" *Bloom v. Metro Heart Group of St. Louis, Inc.*, 440 F.3d 1025, 1030 (8th Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1985)).  Thus, a "genuine issue" is more than "some metaphysical doubt as to the material facts," *Nitro Distrib.,* 565 F.3d at 422 (quoting *Matsushita,* 475 U.S. at 586-87), and "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Bloom*, 440 F.3d at 1029-30 (emphasis and quotation marks removed) (quoting *Anderson*, 477 U.S. at 247-48).

## DISCUSSION

Aschenbrenner claims that she is entitled to damages under the FLSA for unpaid overtime, an equal amount of liquidated damages, pre-judgment interest, attorneys' fees, and costs.  Dollar General argues that Aschenbrenner is not entitled to such damages because she was properly classified as an exempt employee under the FLSA.  Generally, the FLSA requires employers pay overtime to employees who work more than forty (40) hours during a workweek; however, an employee who works in a "bona fide executive, administrative, or professional capacity" is exempt from this overtime pay requirement (hereinafter "managerial exemption").  *See* 29 U.S.C. §§ 207(2), 213(a)(1). Dollar General bears the burden of proving that Aschenbrenner was an exempt employee.  *See Idaho Sheet Metal Works, Inc. v. Wirtz*, 383 U.S. 190, 206 (1966).  Moreover, the Supreme Court

14

has made it clear that all exemptions from the FLSA overtime pay requirement must be "construed narrowly against the employers seeking to assert them and their application limited to those establishments plainly and unmistakably within their terms and spirit." *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392 (1960).  Although the manner in which an employee spends his or her time at work is a question of fact, the question of whether an employee's duties satisfy an exemption to the overtime pay requirement under the FLSA is a question of law.  *Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 714 (1986).

The Department of Labor's regulations provide the appropriate rubric of analysis for the managerial exemption.  The DOL amended the regulations defining the managerial exemption on August 23, 2004.  Prior to August 23, 2004, the relevant regulation contained a "short test" and a "long test" that interpreted the managerial exemption.  *See* 29 C.F.R. § 541.1 (2003).  The long test applied if the employee earned at least $155.00 per week; the short test applied if the employee earned at least $250.00 per week.  Under the short test, an employee was exempt from the overtime pay requirement if, in addition to (A) earning "a salary basis at a rate of not less than $250 per week[,]" the employee (B) was responsible for "the customary and regular direction of the work of two or more other employees[,]" and (C) had a "primary duty consist[ing] of the management of the enterprise in which the employee is employed . . . ."  29 C.F.R. § 541.1(f) (2003); *see also Jones v. Virginia Oil Co.*, 69 Fed. Appx. 633, 636 (4th Cir. 2003).

The DOL regulations effective August, 23, 2004, changed the minimum salary for the short test and added a fourth requirement to the managerial exemption. Under the current regulations, an employer bears the burden of proving the following: the employee is "[c]ompensated on a salary basis at a rate of not less than $455 per week"; the

15

employee's "primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof"; the employee "customarily and regularly directs the work of two or more other employees"; and the employee "has the authority to hire or fire other employees or [the employee's] suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight." 29 C.F.R. § 541.100(a) (2011).

The pre-2004 DOL regulations govern this case because it is undisputed that Dollar General did not employ Aschenbrenner on or after August 23, 2004. Specifically, the pre-2004 short test governs this case because it is undisputed that Aschenbrenner earned more than $250 a week during her entire tenure with Dollar General. Thus, Dollar General has satisfied the first part of the pre-2004 short test, and Dollar General is entitled to summary judgment if it can also prove that Aschenbrenner was responsible for "the customary and regular direction of the work of two or more other employees"; and her "primary duty" was the "management" of the stores where she worked. *See* 29 C.F.R. § 541.1(f) (2003).

The Court concludes that Dollar General has satisfied the second part of the pre-2004 short test based on the undisputed facts. Generally, each store Aschenbrenner worked at was staffed with one ASM, one Lead Clerk, and several other clerks. Aschenbrenner admits that she was the person who prepared the store schedule every week.[15] (Filing No. 73-46, 2010 Dep., at 73:15-19.) Aschenbrenner also admits that she

---

[15] The Court notes Aschenbrenner testified that she did delegate the task of preparing the schedule after she submitted her resignation and when she was on vacation, however, these facts do not alter the analysis, which is based on "customary and regular" responsibilities of the employee. *See* 29 C.F.R. § 541.1(f) (2003).

supervised more than eighty (80) hours a week of employee time.  (Filing No. 73-45, Aschenbrenner Dep., 2005 at 51:1-4 (hereinafter "2005 Dep.").)  In light of this evidence, no triable issue of fact remains as to whether Aschenbrenner was responsible for "the customary and regular direction of the work of two or more other employees."  29 C.F.R. § 541.1(f) (2003); *see Murray v. Stuckey's, Inc.*, 50 F.3d 564, 567, n. 2 (8th Cir. 1995) ("It is clear from the regulations that this criterion is met if an employee supervises several part-time employees whose total hours of work are the equivalent of two full-time employees.") (hereinafter "*Murray II*").  Accordingly, the only issue remaining is the third part of the test: whether Aschenbrenner's primary duty was the management of the store where she worked.

A review of the relevant regulations and the authorities briefed by both parties on the primary-duty issue makes clear that, although the factors for consideration are well defined, they are not subject to mechanical application.  For example, in support of their particular position on this issue, both parties provided the Court with numerous citations to apposite authorities from other districts.   All of the cited cases involved plaintiffs similar to Aschenbrenner, many involved Dollar General as the defendant, and all provided extensive discussion of the same "primary duty" issue.  Nevertheless, some courts granted summary judgment in favor of the defendant on the issue, while others denied it.[16]  This result is not surprising given the fact specific nature of the inquiry.  Even the regulations state that the determination requires an individualized inquiry.  In sum, although the authorities cited by

---

[16] *Compare, e.g., Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233 (11th Cir. 2008) (affirming jury verdict in collective action against Family Dollar Store in suit challenging the exempt status of its store managers), *with In re Family dollar FLSA Litigation*, 637 F.3d 508 (4th Cir. 2011) (affirming summary judgment in favor of Family Dollar Store in suit challenging the exempt status of a store manager).

both parties are apposite, none is determinative of the instant matter.[17]   Instead, the ultimate determination of an employee's primary duty "must be based on all the facts in a particular case."  29 C.F.R. § 541.103 (2003).

The pre-2004 DOL regulations enumerate five factors[18] to be considered when determining whether an employee's primary duty is management: (1) time spent in the performance of managerial duties; (2) the importance of the employee's managerial duties as compared with non-managerial duties; (3) the frequency with which the employee exercises discretionary powers; (4) the employee's relative freedom from supervision; and (5) the relationship between the employee's salary and the wages paid non-exempt employees.  29 C.F.R. § 541.103 (2003).  This determination is based on the totality of the circumstances and no one factor is dispositive of the issue.   *See Counts v. S.C. Elec. & Gas Co.*, 317 F.3d 453, 456 (4th Cir. 2003) ("It is clear from this language [in 29 C.F.R. § 541.103 (2003)] that "primary duty" is meant to be assessed by the totality of the circumstances.").  As such, the Court will address each of the five factors in turn.

1.      **Time spent on management duties**

Under pre-2004 DOL regulations "management" duties include, but are not limited to the following:

> Interviewing, selecting and training of employees; setting and adjusting their
> rates of pay and hours of work; directing their work; maintaining their
> production or sales records for use in supervision or control; appraising their

---

[17] Similarly, the Court's granting of summary judgment in the instant matter does not necessarily mean that summary judgment in favor of Dollar General is appropriate with regard to the other, related cases pending before this court.

[18] Aschenbrenner briefed her position under the post-2004 regulations, which collapse the third and fourth factor into a single factor, however, Aschenbrenner's brief can easily be applied to the pre-2004 regulations without prejudicing her position and such application does not alter the Court's analysis.

> productivity and efficiency for the purpose of recommending promotions or other changes in their status; handling their complaints and grievances and disciplining them when necessary; planning the work; determining the techniques to be used; apportioning the work among the workers; determining the type of materials, supplies, machinery or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety of the [employees] and the property.

29 C.F.R. § 541.102(b) (2003).

The same regulations also provide that any employee who spends more than 50 percent of his or her time performing managerial work will normally satisfy the primary-duty requirement. *See* 29 C.F.R. § 541.103 (2003). Nevertheless, the DOL regulations also emphasize that "[t]ime alone . . . is not the sole test, and in situations where the employee does not spend over 50 percent of [his or her] time on managerial duties, [he or she] might nevertheless have management as [his or her] primary duty if the other pertinent factors support such a conclusion." 29 C.F.R. § 541.103 (2003); *see also Dalheim v. KDFW-TV*, 918 F.2d 1220, 1227 (5th Cir. 1990) ("[A]n employee's 'primary duty' cannot be ascertained by applying a simple 'clock' standard that contrasts the amount of time each day an employee spends on exempt and nonexempt work."). In addition, the Eighth Circuit has made it clear that "the fact that an employee spent 65 to 90 percent of his time on nonexempt tasks 'is not a controlling factor under the regulations' for determining whether the employee was exempt from the FLSA's overtime provisions." *Spinden v. G.S. Roofing Products Co., Inc.*, 94 F.3d 421, 427 (8th Cir. 1996) (*quoting Murray v. Stuckey's Inc.*, 939 F.2d 614, 618 (8th Cir. 1991) (hereinafter "*Murray I*")). Instead, the percentage of time an employee spends on nonmanagerial tasks is simply one of the factors used in determining whether management is that employee's primary duty. *Cf. Spinden*, 94 F.3d at 427 ("[T]he

19

percentage of time an employee spends on administrative tasks is but one factor in determining if administration is that employee's primary duty").  Moreover, "a number of federal courts have 'disregarded the time factor of the 'short test' where the manager is in charge of a separate facility such as a convenience store or restaurant chain location.'"  *Haines v. S. Retailers, Inc.*, 939 F. Supp. 441, 449 (E.D. Va. 1996) (*quoting Meyer v. Worsley Cos., Inc.*, 881 F. Supp. 1014, 1020 (E.D.N.C. 1994)).

Viewing the facts in the light most favorable to Aschenbrenner, the record establishes that she spent over half of her time performing non-managerial work. Aschenbrenner testified that she spent about 85 percent of her time performing non-managerial tasks.  (*See* Filing No. 73-46, 2010 Dep., at 130:3-7.)  However, even accepting the premise that Aschenbrenner spent 85 percent of her time performing non-managerial tasks, the record also establishes – and Aschenbrenner admits – that she simultaneously performed many of her management tasks.  (*Id.* at 141:15-142:1.)  For example, while Aschenbrenner was unloading the shipment truck, she was also directing the store clerks and other employees who were also unloading the truck.  (*Id.* at p. 117:18-120:1.)  While Aschenbrenner was stocking the shelves she was also engaged in directing store clerks, guarding against shoplifting, and observing and taking care of customers.  (*Id.* at 100:20-101:2.)

Aschenbrenner argues that she was often alone at the store from 8 a.m. until 11 a.m. and that she was not supervising any employees during those times.  However, Aschenbrenner testified that the morning hours were usually the slowest times at the store, with the busiest time being a little after 5:00 p.m., and she would take these factors into consideration and would schedule herself to work "in order to save that payroll."  (Filing No.

20

73-45, 2005 Dep., at 115:16-116:13.)  Thus, being alone at the store was Aschenbrenner's decision, not one dictated to her by Dollar General.  As such, Aschenbrenner was exercising managerial decision-making when she chose to work alone in the store. Accordingly, this argument is not persuasive.  Moreover, "there is no requirement that, in order to supervise an employee, a manager must be constantly physically present at the store with that employee."  *Smith v. Heartland Automotive Services, Inc.*, 418 F. Supp.2d 1129, 1141 (D. Minn. 2006) (*citing Baldwin v. Trailer Inns, Inc.*, 266 F.3d 1104, 1117 (9th Cir. 2001)).

That Aschenbrenner may have spent 85 percent of her time performing non-managerial tasks and sometimes worked alone in the store is not determinative of the primary-duty issue, and the Court must consider the other relevant factors.  *See* 29 C.F.R. § 541.103 (2003); *see also Horne v. Crown Cent. Petroleum, Inc.*, 775 F. Supp. 189, 190 (D.S.C. 1991) (holding the amount of time spent on non-managerial tasks is not dispositive of the issue, "particularly when non-management duties are performed simultaneous to the supervision of employees or other management tasks and other factors support a finding that the employee's primary duty is managerial.").

## 2.    The importance of managerial duties

The next factor is the relative importance of Aschenbrenner's managerial duties as compared with her non-managerial duties. *See* 29 C.F.R. § 541.103 (2003).  When evaluating this factor, in addition to considering  the work actually performed by the employee on a day to day basis, the Court must consider Aschenbrenner's job description, performance review criteria, bonus plan, and training.  *See e.g. Mayne-Harrison v. Dolgencorp, Inc.*, No. 1:09-cv-42, 2010 WL 3717604, at *20 (N.D. W. Va. Sept. 17, 2010)

(concluding the importance of plaintiff's managerial duties was evidenced by the manager's training); *Addison v. Ashland, Inc.*, No. Civ. 04-40085, 2006 WL 752761, at *3 (E.D. Mich. Mar. 23, 2006) (concluding plaintiff's managerial duties were important because the plaintiff's performance review was based on managerial activities); *Moore v. Tractor Supply Co.*, 352 F. Supp. 2d 1268, 1275 (S.D. Fla. 2004) (concluding plaintiff's managerial duties were important because his year-end bonus was tied to the store's performance). Ultimately, "courts frame[ ] this query as a measure of the significance of the managerial tasks to the success of the facility." *Haines*, 939 F. Supp. at 450; *see also Donovan v. Burger King Corp.*, 675 F.2d 516, 521 (2d Cir. 1982) (concluding the restaurant could not have operated successfully in the absence of assistant managers who determined the amount of food to be prepared, checked inventory, scheduled employees and directed them to particular tasks). As applied, the Court must consider whether Aschenbrenner's store could have operated as successfully without the managerial tasks carried out by Aschenbrenner.

Aschenbrenner's own deposition testimony demonstrates the importance of her role as store manager. She acknowledged many times that she was ultimately accountable for the store's success or failure. (*See e.g.*, Filing No. 73-46, 2010 Dep., at 128:9-21; Filing No. 73-45, 2005 Dep., at 104:16-20.) Further, she testified that she was responsible for training employees and ensuring the store was properly staffed, as well as controlling costs and minimizing shrink, which, in turn, increased profitability. (Filing No. 73-46, 2010 Dep., at 24-33.) She admitted she bore the ultimate responsibility for her store when she compared her job as a Dollar General store manager to her job as an assistant manager for Michael's Arts and Crafts. (*See id.* at 128:13-17) ("As an assistant [manager at

22

Michael's] you don't have the pressure that you do as a [Dollar General] store manager.")

A comparison of the condition of Aschenbrenner's stores before and after her taking over as store manager underscores the importance of her role as store manager. Aschenbrenner testified that, although she had Store No. 2788 "in line" and "all cleaned up" before she moved to Store No. 2749 in 1999, when she returned to Store No. 2788 in 2000 "[i]t was just a broken store." (Filing No. 73-45, 2005 Dep., at 22; Filing No. 73-46, 2010 Dep., at 87:16-88:1.) Aschenbrenner stated that when she returned to Store No. 2788, her priority as store manager was to get the store turned around and she believed the employees just needed "better management or direction." (*Id.* at 87:16-89:19.) Dollar General also placed a great deal of value in Aschenbrenner as a manager, as evidenced by the fact that she was permitted to keep her salary when she returned to Store No. 2788, despite company policy providing for a lower salary. (*See* Filing No. 73-45, 2005 Dep., at 25:1-12 ("I would be interested in coming back [to Store No. 2788] if I could keep [my salary] because the [salary] would have been different otherwise.").)

The importance that Dollar General placed on Aschenbrenner's managerial duties is established by the store manager's job description, the criteria on which her performance was evaluated, and her bonus plan. While the store manager job description does list manual labor requirements, it also lists the following essential job functions and duties that are managerial in nature: providing training for employees, conducting performance evaluations of employees, ensuring the store is appropriately staffed, and ensuring the store is effectively opened and closed each day, and providing superior customer service leadership. (Filing No. 67-5, 2002 Job Description.) Aschenbrenner's performance was evaluated based on the following managerial duties: managing controllable expenses,

23

managing shrink, training and development of store employees, ensuring employee and customer safety, ensuring customer satisfaction, increasing sales volume, and increasing profitability. (Filing No. 66-8, Store Manager Performance Evaluation Forms.) Similarly, Aschenbrenner's bonuses were based on her store meeting sales goals, minimizing shrink, and maximizing profits, not her individual performance. (Filing No. 66-9, Teamshare Bonus Plans.)

In addition, the training Aschenbrenner received shows that Dollar General valued store managers differently from other employees. When Aschenbrenner was hired as store manager for Store No. 2788, Dollar General sent her to Store No. 2749 for two weeks of training. (Filing No. 73-45, 2005 Dep., at 19:21-20:1.) Only store managers underwent such training. Accordingly, the purpose of this training was to teach her "the procedures of running a store like the paperwork and things like that." (*Id.* at 20:5-13.) Aschenbrenner argues that her training is evidence that her non-management duties were more important because she spent the majority of her training stocking shelves. (Filing No. 72 at 15.) That Aschenbrenner spent her time on such tasks while at training is inapposite to the Court's analysis. To the contrary, her training is significant because Dollar General provided two weeks of off-site training for store managers, but not for other employees. As such, Aschenbrenner's training at Store No. 2749 is evidence that Dollar General valued her differently from other employees.

Aschenbrenner contends that her performance of manual labor had a larger impact on the store's profitability than did the performance of her managerial duties. In support of this assertion Aschenbrenner cites her own deposition testimony (Filing No. 73-46, 2010 Dep., at 130:8-11). The Court's review of the record provides no support for this assertion.

24

Moreover, Aschenbrenner has not pointed to any evidence that contradicts the job description, performance review criteria, or bonus plan.

Aschenbrenner also argues that summary judgment is inappropriate because a factual question remains as to what duties (managerial or nonmanagerial) were relatively more important. Specifically, Aschenbrenner argues that her excessive time spent on nonmanagerial duties creates a triable issue. She cites *Plaunt v. Dolgencorp, Inc.*, Nos. 3:09-cv-079, 1:09-cv-084, 2010 WL 5158620, at *8 (M.D. Pa. Dec. 14, 2010), as support for her position. The court in *Plaunt* denied summary judgment, citing *inter alia* a fact issue concerning the importance of the employee's managerial duties. *Id.* The Court rejects this reasoning because the Supreme Court has made it clear that determining whether an employee fits an exemption to the overtime pay requirement of the FLSA is a question of law, not a question of fact. *See Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 714 (1986). As such, the Court does not find the reasoning in *Plaunt* persuasive.

Aschenbrenner also argues with respect to this factor that she did not control her store's labor budget. This argument is also unpersuasive. Although the labor budget limited the number of employee hours that could be scheduled by Aschenbrenner in a given workweek, and may have required Aschenbrenner to spend some of her time performing nonmanagerial tasks, the allegedly small budget did not alter Aschenbrenner's primary duty to manage the store. Thus, although Dollar General limited the total number of employee hours in a given workweek, Aschenbrenner had full control as to how to allocate those hours between the employees at her store.

Finally, Aschenbrenner contends that the Court should focus solely on the tasks she actually performed in determining the importance of her duties. Aschenbrenner asserts

that her most important duties were virtually identical to those of the store clerks: stocking shelves and serving customers.  Aschenbrenner argues that she needed to hire more store clerks (or schedule existing clerks for more hours), but that labor budget constraints prevented her from doing so.  As a result, Aschenbrenner performed many non-managerial duties herself.  This argument fails because it is based on the flawed premise that an employee's status is based solely on the work he or she actually performed. Aschenbrenner's argument would disregard the employee's job description, performance review criteria, and bonus plan, leading to a status determination based entirely on choices made by the employee, and not the employer.  Under such a rule, a manager theoretically could choose to perform nonmanagerial tasks rather than managerial tasks and be eligible for overtime pay under the FLSA.  The Court will not embrace such a theory.  Instead, like other courts that have addressed the primary-duty issue, this Court must considered all relevant evidence.  *See generally Moore v. Tractor Supply Co.*, 352 F. Supp. 2d 1268, 1275 (S.D. Fla. 2004).

Based on an analysis of the facts, viewed in the light most favorable to Aschenbrenner, the Court concludes that the managerial duties performed by Aschenbrenner were relatively more important than her nonmanagerial duties.  This conclusion follows from Aschenbrenner's job description, performance review criteria, bonus plan, training, and the tasks she actually performed while at work.  Most important, Aschenbrenner's own testimony supports the conclusion that her managerial duties represented the most important part of her job.  When confronted with the same issue and presented with similar facts, other courts have granted summary judgment in favor of the employer.  *See, e.g.*, *Thomas v. Speedway SuperAmerica, LLC*, 506 F.3d 496, 505 (6th

Cir. 2007); *Donovan v. Burger King Corp.*, 675 F.2d at 521 (2d Cir. 1982); *Mayne-Harrison*, 2010 WL 3717604, at *21; *Horne*, 775 F. Supp. at 191 ("The clerks merely rowed the boat; [the store manager] charted and steered its course."); *King v. Dolgencorp, Inc.*, No. 3:09-cv-00146, 2010 U.S. Dist. LEXIS 140302, at *35 (M.D. Pa. May 6, 2010) (finding that "[i]f [the] plaintiff did not perform her nonmanagerial duties, her Dollar General store may not have functioned well; but if she did not perform her managerial duties, the store would have been incapable of doing business.") For these reasons, the Court concludes that this factor favors granting summary judgment.

### 3.    Exercise of discretionary powers

Next, the Court must evaluate the frequency with which Aschenbrenner exercised discretionary powers.   Generally, the exercise of discretionary powers involves the comparison and the evaluation of possible courses of conduct and making a decision after the various possibilities have been considered.  *See* 29 C.F.R. § 541.107(a) (2003).  This factor implies the employee has authority to make an independent choice, free from direction or supervision.  *See id.*  In other words, "[a] person whose work is so completely routinized that he has no discretion does not qualify for exemption."  *Id.*  However, the exercise of discretionary powers does not require that the decisions made by the employee must have a finality that goes with unlimited authority and a complete absence of review. *See Murray I*, 939 F.2d at 619 ("[T]he manager of a local store in a modern multi-store organization has management as his or her primary duty even though the discretion usually associated with management may be limited by the company's desire for standardization and uniformity.").  That an employee's decision may be subject to review and that, on

27

occasion, the decisions are revised or reversed after review does not mean that the employee is not exercising discretion.  *See id.*

Aschenbrenner argues that she had very little, if any, ability to exercise discretion. First, she asserts that Dollar General controlled the store's layout through the use of planograms.  Aschenbrenner also points to the SOP manuals to show her inability to exercise discretion.  These manuals provided detailed instructions regarding the day-to-day operations of the store.  For example, they provided guidance on how to answer the telephone while also running the cash register, what items should be hung on a clipboard in the store's office, how to handle weather emergencies, and what steps should be taken to ensure the floor was clean.  In sum, Aschenbrenner argues that "the micromanagement of the store by [Dollar General] corporate headquarters and the district managers" prevented her from exercising any discretion or independent judgment.  (Filing No. 72, Pl. Br., at 29.)

However, Aschenbrenner's own testimony refutes her argument that she lacked discretion regarding her store's layout.  Aschenbrenner testified that the planograms always provided  "manager's choice" end-caps and also provided flex space.  (Filing No. 73-46, 2010 Dep., at  76:1-21.)  Aschenbrenner, not her DM or Dollar General, decided what products were displayed on the "manager's choice" end-caps and in the flex space.  (Filing No. 73-45, 2005 Dep., at 67:12-69:5.)  Aschenbrenner also testified that:

> In the seasonal [areas] they weren't as strict when I was there.  I could kind of play around with the seasonal areas, like the Christmas areas, especially once the stuff started selling down.  They would kind of give you an idea where they wanted it.  But once the stuff would start selling down then you could just play with it to get the merchandise out.

(*Id.* at 69:18-70:4.)

Moreover, in her 2010 deposition, Aschenbrenner testified that "[w]henever you do a planogram, sometimes they don't exactly fit onto what our counter is and you have to readjust . . . ."  (Filing No. 73-46, 2010 Dep., at 112:17-21.)  Aschenbrenner also testified that when the merchandise on other end-caps sold down she would decide how to fill it back up.  (*Id.* at 113:6-9.)  Aschenbrenner testified that she would walk the store daily to determine where merchandise needed to be filled out and would "make adjustments."  (*Id.* at 113:17-114:20.)  As a result, Aschenbrenner stated that "every time" she "walk[ed] in the store" she was "looking to see what [had] to be adjusted."  (*Id.* at 114:16-20.)

In regard to the SOP manuals, a full review of the record provides no evidence to support the assertion that the manuals virtually eliminated Aschenbrenner's ability to exercise discretion.  She viewed the manuals as "reference material" and used them when she "needed to look something up."  (*Id.* at 104:14-17.)  She also agreed that the SOP manuals did not "tell you how to handle every situation in your store."  (*Id.* at 104:21-105:1.)  Moreover, the fact that Dollar General maintained SOP manuals for the sake of consistency does not mean that Aschenbrenner never exercised discretion.  *See Murray I*, 939 F.2d at 619 ("Like other courts that have considered the question, we believe that the manager of a local store in a modern multi-store organization has management as his or her primary duty even though the discretion usually associated with management may be limited by the company's desire for standardization and uniformity.").

Aschenbrenner's deposition testimony is filled with statements demonstrating that she frequently exercised discretion and independent judgment.  For example, she had discretion to hire, train, and conduct performance reviews of store clerks. (Filing No. 73-46, 2010 Dep., at 25:23-26:14.)  She also had discretion to decide how and when to use her

labor budget. (*Id.* at 73:15-25.) In doing so, she chose which store employees would be allocated hours, and how many hours to allocate to them. (*Id.* at 28:7-14.) She directed the work of her employees by assigning them certain areas to stock or recover and by delegating tasks to specific employees. (*Id.* at 27:11-15, 117:1-5.) When Aschenbrenner was going to be out of her store, she prepares a list of tasks to be completed by her employees. (*Id.* at 99:22-100:10.)

Aschenbrenner also exercised discretion in the training of her employees. For example, she testified that she often held safety meets prior to unloading a shipment truck. (*Id.* at 122:12-17.) In such meetings she reminded her employees of the safety issues related to unloading trucks and stocking shelves. (*See id.* ("Remember, you guys have got to bend at your knees, lift with your legs . . .").) Aschenbrenner also held a ten-to-fifteen minute monthly safety meeting with her employees to conduct a more detailed review of safety procedures. (*Id.*)

The Court notes that the evidence demonstrates that Aschenbrenner did not wield the ultimate authority with regard to hiring ASMs, promoting employees, and terminating employees. Nevertheless, Aschenbrenner testified that her recommendations with regard to promoting and terminating employees were almost always followed.[19] (Filing No. 73-45,- 2005 Dep., at 82:1-13.) Similarly, Aschenbrenner agreed that, short of termination, she had the discretion to discipline store employees and consulted with her DM only if it was something major. (*See id.* at 87:2-88:3 ("If it was something major, then I would ask her, you know, how to handle this.").)

---

[19] Aschenbrenner testified that, at most, one employee she recommended for an ASM position was not promoted, and she could not recall the name of that person. (Filing No. 73-45, 2005 Dep., at 82:1-13.)

In support of her position, Aschenbrenner also points to the fact that she had no discretion in some areas, such as setting the initial pay rate of employees, determining which items should be sold in her store, determining the quantity of items that should be ordered, and determining the prices of store merchandise.  (*See* Filing No. 73-45, 2005 Dep., at 65:17-66:6.)  The essential thrust of this argument is that because she was not afforded unfettered discretion to run her store, to spend Dollar General's money, and to dictate the exact products sold or the prices charged, management was not her primary duty.  The Court disagrees.  That a chain of command exists in a company does not render all but the highest employee in the chain nonexempt; store managers can be in charge of a store in different ways and on different levels.  *See Diaz v. Team Oney, Inc.*, 291 Fed. Appx. 947, 949-950 (11th Cir. 2008).  Here, it is clear that Aschenbrenner performed many of the managerial duties listed in the DOL regulations, such as interviewing, hiring and training of employees; directing employees' work; planning the work; apportioning the work among the workers; and providing for the safety of the employees and the property.  *See* 29 C.F.R. § 541.102(b) (2003).  As such, the Court concludes that Aschenbrenner was vested with sufficient discretionary powers to qualify for the managerial exemption to the overtime pay requirement under the FLSA.

**4.      Freedom from supervision**[20]

The next factor the Court must consider is Aschenbrenner's relative freedom from supervision.  Aschenbrenner claims that her work was heavily supervised by Dollar General

---

[20] The plaintiff addressed the third and fourth factors jointly; however, because the pre-2004 DOL regulations address these factors separately, the Court engages in a separate analysis.

and that her DM[21] had significant, if not sole authority, over store operations.  However, the record does not reflect that upper management heavily supervised Aschenbrenner's work.

Aschenbrenner estimated that she saw her district manager only about once every six weeks.  (Filing No. 73-45, 2005 Dep., at 56:10-16.)   The visits generally lasted approximately half a day, for a total of approximately thirty-five (35) hours of supervision per year, on average.  (*Id.* at 56:20-57:14.)  Aschenbrenner agreed that her DM spent less time visiting her stores and more time with "new managers or the stores that were in trouble."  (Filing No. 73-46, 2010 Dep., at 79:15-17.)  When asked if the DM spent less time with her because the DM knew that she was "on top of it," Aschenbrenner answered "Yes." (*Id.* at 79:21-22.)  When her DM did stop by, the DM would walk through the store and give Aschenbrenner "ideas for things that [the DM] thought could improve the store."  (*Id.* at 80:7-13.)  Each of these facts supports a finding that Aschenbrenner was relatively free from supervision.

Aschenbrenner's phone communications with her DM were also limited.  Although Aschenbrenner testified that she "[d]id a lot of phone calling" with her DM, she also testified that generally, she only called her DM for issues she could not resolve independently.  (*Id.* at 84:11-85:6.)  Aschenbrenner also testified that when she spoke with her DM on the phone, it was because the DM was returning a call from Aschenbrenner.  (*Id.* at 84:17-23.) Moreover, Aschenbrenner agreed that her DM never interfered with her ability to hire store employees, schedule store employees, review and rate store employees, plan work in the store, or deal with vendors.  (*Id.* at 80:24-82:22.)   In sum, the DM did not tell

---

[21] Aschenbrenner had three DMs while employed by Dollar General.  (*See* Filing No. 73-45, 2005 Dep., at 26:18-28:10.)  Because Aschenbrenner did not indicate her experience varied from one DM to another, and for ease of reading, this discussion speaks in terms of one, generic district manager.

Aschenbrenner how to run the store on a day-to-day basis, nor was the DM present to influence how Aschenbrenner chose to run her store.

Aschenbrenner saw her regional manager, Ray Thompson, less frequently than her DM.  (*Id.* at 144:18-21.)  Aschenbrenner only saw her regional manager "once a year, maybe twice."  (*Id.* at 144:23-24.)  When asked how often she would see Ray Thompson, Aschenbrenner answered: "Not enough."  (*Id.* at 144:5-6.)  During these infrequent visits, Thompson gave Aschenbrenner advice on personal issues, not day-to-day store management issues.  (*Id.* at 145:1-4.)  For example, in regard to her goal of becoming a DM, Thompson told Aschenbrenner that she "had to go to a metro store in order to get that feather in her pocket and move farther up."  (*Id.* at 144:10-15.)  For these reasons, a reasonable jury could only conclude that Aschenbrenner was vested with enough freedom from supervision to qualify for the managerial exemption.  *See Thomas*, 506 F.3d at 507 (noting that despite the constant availability of the district manager to the store managers, and despite the fact that the district manager was in the store once or twice a week and was frequently in touch via phone and email, plaintiff was relatively free from supervision); *Meyer*, 881 F. Supp. at 1021 ("[W]e do not believe that the local store manager's job is any less managerial for FLSA purposes simply because he or she has an active regional manager boss.").

### 5.    Aschenbrenner's salary as compared to other employees

Finally, the Court must consider the relationship between Aschenbrenner's salary and the wages paid to other, non-exempt employees.  *See* 29 C.F.R. § 541.103 (2003). The parties dispute the proper method for determining whether an exempt employee's salary is sufficiently higher than a non-exempt employee's wages to support invocation of

the managerial exemption. Aschenbrenner argues that if her salary were divided by the number of hours she actually worked and reduced to an hourly rate, her hourly rate would not be much higher than that of her store's ASM.  *See e.g., Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1257-58 (11th Cir. 2008) (calculating manager's hourly wage and comparing it to hourly wage paid to non-exempt employees); *Thomas*, 506 F.3d at 508-09 (same); *Johnson v. Big Lots Stores, Inc.*, 604 F. Supp. 2d 903, 918 (E.D. La. 2009) (same). Dollar General counters that it is improper for the store managers to convert their salaries to an hourly wage and the Court should simply compare Aschenbrenner's weekly salary to the earnings of other store employees during the same time period.  *See* 29 C.F.R. § 541.103 (2003); *Moore*, 352 F. Supp. 2d at 1279 (stating that "mathematical gymnastics" of an hourly wage calculation are not required; instead the court should simply compare the manager's weekly salary with the highest non-exempt weekly wage).

No specific mathematical formula is prescribed for determining whether an allegedly exempt employee's salary is `than a non-exempt employee's wage.  *See id.* at 1278. However, even if the Court were to use Aschenbrenner's method of wage comparison, it does not lead to a finding in favor of Aschenbrenner.  In other words, "[r]egardless of the standard used, the gap between [Aschenbrenner's] wages and the wages paid to the other employees at the store was significant."  *Johnson v. DG Retail LLC*, No. 1:08-cv-123, 2010 WL 1929620, at *4 (D. Utah May 13, 2010).

Aschenbrenner testified that she worked 55 hours per week on average.  (Filing No. 73-46, 2010 Dep., at 19:11-14.)   At her January 2001 salary of $576.02 per week,[22]

---

[22] Aschenbrenner's salary increased over the course of her employment with Dollar General.  In January 2001, she earned $576.02 per week.  By April 2001, she was earning $594.23 per week.  In 2002, when she left Dollar General, she was earning $612.06 per week.  (Filing No. 73-46, 2010 Dep., at 20:6-21:19.)  These changes in Aschenbrenner's salary do not significantly impact the Court's analysis.

34

Aschenbrenner's effective hourly rate of pay was $10.47 per hour. The next highest paid employee at the store, the ASM, earned between $6.50 and $7.50 per hour during Aschenbrenner's tenure. (*Id.* at 36:18-44:8.) Thus, compared to the maximum ASM pay rate of $7.50 per hour, Aschenbrenner earned $2.97 per hour more than the ASM, which Aschenbrenner argues is not a significant difference. The Court disagrees. Even under Aschenbrenner's method, Aschenbrenner's lowest salary, and the ASM's highest salary, Aschenbrenner still earned significantly more than the ASM, the next highest paid employee at her store. Under this calculation Aschenbrenner earned $2.97 per hour more than the store's ASM or 39.64 percent, an amount several courts have found to be significant.[23]  *See Thomas*, 506 F.3d at 509 (finding that a store manager earning 30 percent more than the next senior employee earned significantly more than her subordinates); *King*, 2010 U.S. Dist. LEXIS 140302, at *44 ("[A] jury could reasonably conclude only that the 35 to 42% greater pay that plaintiff received passes the threshold of significance required to support application of the executive exemption."); *Moore*, 352 F. Supp. 2d at 1278 (noting that courts have found that a store manager earning 42 percent more than the next senior employee earned significantly more than subordinates).

Moreover, the Court must also consider that Aschenbrenner's salary was not the totality of her compensation. Aschenbrenner also received performance based bonuses, that the Court must consider. *See Mayne-Harrison*, 2010 WL 3717604, at *23 (considering an employee's bonuses when determining whether he earned significantly more than

To illustrate this point, the Court will use Aschenbrenner's lowest salary (January 2001) in this analysis.

[23] Using Aschenbrenner's method, Aschenbrenner's highest salary ($612 per week = $11.13 per hour), and the ASM's lowest salary ($6.50 per hour): Aschenbrenner earned 71.20 percent more than the store's ASM. Using Aschenbrenner's method, an average of Aschenbrenner's salary ($594 per week = $10.80 per hour), and an average of the ASM's salary ($7.00 per hour): Aschenbrenner earned 54.22 percent more than the store's ASM.

nonexempt employees).  Aschenbrenner received two bonuses while she was classified as an exempt employee: in 2001 she received $5900; and in 2002 she received $7675. (Filing No. 73-46, 2010 Dep., at 20:17-19, 21:8:12.)  Although other employees were also eligible for bonuses during this time period, as a store manager, Aschenbrenner received a significantly larger bonus than other employees.  As a store manager, Aschenbrenner could receive a bonus of up to 10 percent of her store's net profit.  (*Id.* at 61:24-62:2.)  In contrast, an ASM could receive a bonus of up to 3 percent of the store's net profit and the store clerks split a bonus pool of at least 2 percent of the store's net profit.  (*Id.* at 62:3-9.) So Aschenbrenner's bonus was more than three times larger than her ASM's bonus and five times larger than the bonus pool split by all store clerks.  As such, a reasonable jury could only conclude that Aschenbrenner was earning substantially more as a store manager than other, nonexempt employees.

## V. CONCLUSION

Upon reviewing the pleadings and the exhibits submitted by the parties, and upon viewing them in the light most favorable to Aschenbrenner, the Court concludes that, as a matter of law, Aschenbrenner qualifies for the managerial exemption from the overtime pay requirement under the FLSA.  Accordingly,

IT IS ORDERED:

1.      Defendant's Motion for Summary Judgment (Filing No. 63) is granted;

2.      Plaintiff Pam Aschenbrenner's claims against Defendant Dolgencorp, Inc., Dollar General Partners, Dolgencorp of New York, Inc., and Dolgencorp of Texas, Inc., are dismissed, with prejudice;

3.     Defendant's Motion to Strike and Objections to Evidence Offered in Opposition to Defendant's Motion for Summary Judgment (Filing No. 74) is denied as moot; and

4.     A separate judgment will be entered.

DATED this 3rd day of June, 2011.

BY THE COURT:


s/ Laurie Smith Camp
United States District Judge